Tracee Plowell, Senior Litigation Counsel (N.Y. Attorney Registration #2994457)
Tracee.Plowell@usdoj.gov
Michelle Pascucci, Trial Attorney (Mass. Board of Bar Overseers #690889)
Michelle.Pascucci@usdoj.gov
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20005
202-616-1668 (Plowell) / 202-307-2208 (Pascucci)

*Attorneys for the United States*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | Case No. 2:19-CR-448-2 |
| Plaintiff,<br>vs.<br>James B. Panther, Jr.,<br>a/k/a "James Suqui" and "James Suquilanda,"<br><br>Defendant. | **UNITED STATES' MOTION IN LIMINE TO INTRODUCE COCONSPIRATORS' STATEMENTS** |

Pursuant to the Court's Scheduling Order entered March 16, 2020, the United States, by and through undersigned counsel, respectfully moves this Court *in limine* to admit coconspirators' statements under Federal Rule of Evidence 801(d)(2).[1]

---

[1] The government has conferred with defense counsel regarding its intent to file this motion under LRCrim 12.1(a) (incorporating LRCiv 7.2(l)). Defense counsel indicated that he has taken the issues raised herein under consideration.

## FACTUAL SUMMARY

On April 23, 2019, an Indictment was filed charging defendants Francisco Villena Abellan, James Panther, Jr., and Faiyez Dean with conspiracy to commit securities and wire fraud in violation of 18 U.S.C. §1349, securities fraud in violation of 18 U.S.C. § 1348, conspiracy to commit money laundering in violation of 18 U.S.C. §1956(h), and four counts of money laundering in violation of 18 U.S.C. § 1957. ECF No. 3. The Indictment alleges that Abellan, Panther, Dean, and others engaged in an international "pump and dump"[2] stock market manipulation scheme involving shares of the company Biozoom, Inc (Biozoom).

As alleged in the Indictment, to effectuate the scheme, the defendants needed to gain control of the free-trading shares of a U.S. publicly traded company. By controlling the majority of the company's shares, the defendants could prevent ordinary market forces from influencing the share price. To that end, in or around October 2012, the defendants purchased Entertainment Art, Inc. (Entertainment Art), a U.S. publicly traded "shell"[3] company that traded on the Over-the-Counter[4] (OTC) market. The defendants used shell companies they controlled, including Seychelles-based Royal Capital Ventures (Royal), to

---

[2] *See* ECF No. 3, ¶ 22.

[3] *Id.* ¶ 25.

[4] *Id.* ¶ 20.

complete the purchase.[5]  The shell companies enabled the defendants to conceal their ownership and control of Entertainment Art.

The defendants ultimately purchased both restricted (or control)[6] and free-trading shares of Entertainment Art.  Because the shares were sold in one transaction, however, all shares should have been deemed restricted.  To make the public believe that the shares were free trading, the defendants orchestrated the sale so it would appear that the shares were purchased in separate transactions.  Coincident with the acquisition of Entertainment Art, the defendants established and funded offshore bank accounts in the names of ten Argentine nationals, who would later serve as nominee shareholders of Entertainment Art (the nominee shareholders).  The initial deposits into the nominee shareholder's bank accounts were supported by fraudulent loan and trust documents which purported to document legitimate loans to the nominee shareholders.  In fact, the loans were funded by the defendants through shell companies such as Royal.

The defendants then identified a German biotech company that was seeking United States investors.  The defendants acquired the company and orchestrated a reverse merger.  As a result of the reverse merger, Entertainment Art became Biozoom on or about March 12, 2013, and the Entertainment Art shares held by the nominee shareholders became Biozoom stock.  Placing Biozoom shares with the nominee shareholders concealed the true

---

[5] *Id.* ¶ 5.

[6] *Id.* ¶ 29.

ownership and control of the shares; concealed the affiliate nature of the purchase of the shares;[7] and created the false appearance that there was a large market in Biozoom. The defendants established accounts in the names of the nominee shareholders at U.S. brokerage houses and traded Biozoom stock using methods such as instant messaging that were designed to conceal the identity of the person trading the shares.

Biozoom began trading in May 2013. Simultaneous with the trading in Biozoom stock, the defendants orchestrated and funded a press campaign of mailers, media advertisements, and articles promoting Biozoom stock using entities they controlled, funded, or otherwise influenced. The defendants also directed other coconspirators to engage in manipulative trading of Biozoom stock throughout trading. As a result of manipulative trading and the aggressive press campaign, Biozoom stock jumped from $1.10 per shares to more than $4 per share in just over a one-month period.

During this time, the defendants, operating through the nominee shareholders, unloaded their high-priced shares onto the investing public. The sale of Biozoom generated approximately $34 million in sales. The defendants transferred proceeds from the unlawful scheme into foreign bank accounts they controlled in the names of the nominee shareholders. The scheme resulted in the defendants generating millions of dollars in proceeds from the sale of Biozoom shares at the expense of investors, who were left with essentially worthless shares.

---

[7] *Id.*

**ARGUMENT**

The defendants in this matter have been charged with conspiracy to commit wire fraud and securities fraud under 18 U.S.C. § 1349 and conspiracy to commit money laundering under 18 U.S.C. § 19569(h). "To prove a conspiracy, the government must show '(1) an agreement to engage in criminal activity; (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime.'"[8] *United States v. McCaleb*, 552 F.3d 1053, 1058 (9th Cir. 2009) (quoting *United States v. Sullivan*, 522 F.3d 967, 976 (9th Cir. 2008)). To prove the money laundering conspiracy, the government must show "(1) the defendant knowingly engaged in a monetary transaction; (2) he knew the transaction involved criminal property; (3) the property's value exceeded $10,000; and (4) the property was derived from specified unlawful activity." *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003).

Under Federal Rule of Evidence 801(d)(2), an opposing party's statement offered against him is not hearsay where the statement "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(e). The government must show three criteria by a preponderance of the evidence to admit coconspirators'

---

[8] Wire fraud has three elements: "(1) proof of a scheme to defraud; (2) using the . . . wires to further the fraudulent scheme; and (3) specific intent to defraud." *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008). Securities fraud has as its elements "(1) fraudulent intent; (2) a scheme or artifice to defraud; and (3) a nexus with a security." *United States v. Motz*, 652 F. Supp. 2d 284, 296 (E.D.N.Y. Aug. 14, 2009) (quoting *United States v. Mahaffy*, 2006 WL 2224518, at *12 (E.D.N.Y. Aug. 2, 2006)).

statements: "(1) the existence of a conspiracy, (2) the defendant's connection to the conspiracy, and (3) that the statement was made during and in furtherance of the conspiracy." *Senegal v. White*, 89 F.3d 846 at *3 (9th Cir. 1996); *see United States v. Inoue*, 463 F. App'x 643, 645 (9th Cir. 2011). The government intends to introduce coconspirators' statements by Abellan, Dean, Gulliermo Ciupiak (Ciupiak),[9] Swiss citizen Walter Demuth (Demuth),[10] and nominee shareholders through witness and documentary evidence.[11] These materials provide evidence of the agreement between the coconspirators and their criminal intent, elements which the government must prove under 18 U.S.C. §§1349 and 1956(h). The proffered evidence, coupled with independent evidence that the government intends to admit at trial, clearly satisfy the requirements for coconspirator statements under Federal Rule of Evidence 801(d)(2).

1. **The Statements Show that a Conspiracy Existed and Were Made in Furtherance of the Conspiracy**

Email evidence shows the defendants acting in concert to establish bank and

---

[9] Ciupiak is identified as Coconspirator 1, or CC1, in the indictment. *See* ECF No. 3, ¶ 5.

[10] Demuth is identified as Coconspirator 2, or CC2, in the indictment. *See* ECF No. 3, ¶ 6.

[11] This motion provides an overview of the coconspirator statements that the government seeks to admit under Federal Rule of Evidence 801(d)(2) and does not contain an exhaustive list of all statements. The coconspirator statements have been provided to the defense under Rule 16 and as Jencks Act material. The government seeks a pretrial ruling on the admissibility of these communications to streamline the presentation of evidence and avoid delays at trial. *See United States v. Martinez*, 5 F.3d 542, at *2 (9th Cir. 1993) (upholding district court's pretrial determination as to admissibility of coconspirators' statements). Under Federal Rule of Evidence 104(a), the Court may, subject to the provisions of Rule 104(b), determine whether a matter proffered may be admitted into evidence.

brokerage accounts in the names of the nominee shareholders and fund those accounts using shell entities, including Allegemeine Finanz & Investment (AFI), a Swiss-based company controlled by Abellan and Ciupiak, and Royal.[12] *See* ECF No. 3, ¶¶ 5, 6. Demuth exchanged trust and loan agreements with Ciupiak and Abellan to fund these accounts while concealing the source of the assets. These actions furthered the conspiracy because funding of the nominee accounts enabled the coconspirators to trade Biozoom shares through brokerage accounts in the names of nominee shareholders and AFI during the "pump" of Biozoom stock. *See United States v. Wilson*, 148 F. App'x 602, 604 (9th Cir. 2005) (explaining that statements are "in furtherance of the conspiracy" where they "set in motion transactions that are an integral part of the conspiracy" (quoting *United States v. Kearns*, 61 F.3d 1422, 1426 (9th Cir. 1995))).

In one such email sent on or about May 17, 2013, Abellan requested that Demuth "get in touch with Steve as soon as possible to get assistance to open an account for AFI at CBH COMPAGNIE BANCAIRE HELVETIQUE SA. . . . Steve knows me by Mark. Please don't mention him my real name." Later, in an email sent on June 26, 2013, Abellan explained to Demuth that he had "found a bank in Austria that is very easy to deal with" and instructed Demuth to "open[] an account at this bank for ROYAL. Being Royal the major investor [*sic*] in AFI, I think we should also open an account for AFI at this place so

---

[12] It is of no weight that Demuth, Ciupiak, and the nominee shareholders are not charged in this Indictment. *United States v. Williams*, 989 F.2d 1061, 1067 (9th Cir. 1993) ("An individual need not be indicted to be considered a conspirator for purposes of rule 801(d)(2)(E).").

we can do internal transfers for investments without gaining attention overseas." A necessary precursor to the defendant's fraudulent scheme was that the coconspirators had a means of trading Biozoom stock without revealing their identities. These emails show the coconspirators opening foreign accounts to fund their trading activity while avoiding the scrutiny of regulators. *See United States v. Diaz*, 2014 WL 1668600, at *4 (D. Nev. Apr. 25, 2014) (explaining that "narrative statements designed to prompt additional action among the conspirators" are admissible under Fed. R. Evid. 801(d)(2)).

The government will also seek to offer evidence of email communications, text messages, and statements by nominee shareholders and individuals purporting to serve as officers of AFI wherein these individuals directed brokers at U.S. brokerage houses to trade Biozoom shares during the "pump" of Biozoom stock. The government expects to present evidence that any electronic or telephonic communications by these individuals were in fact made by the coconspirators, who were using these identities to trade Biozoom stock. Just as the coconspirators opened bank and brokerage accounts to fund Biozoom trading, they used email and instant messaging accounts to direct brokerage houses to trade Biozoom stock during the "pump."

**2. The Statements Evidence the Defendant's Involvement in and Knowledge of the Conspiracy**

Email communications between Demuth, Abellan, and the defendant also show "the defendant's connection to the conspiracy." *See Senegal*, 89 F.3d at *3. In a series of emails dated February 20, 2013, Demuth and Abellan sought to open an offshore bank account for a shell company that they controlled based in the British Virgin Islands. Demuth sent an

email to a representative of CIM Banque in Switzerland requesting assistance opening the account: "My clients typically search for Investment opportunities in Western European businesses (as equity stakeholders or finance investors).  For the purpose of my business, I would like to open an account at CIM Bank."  In the email, Demuth asked about a telephone conversation in which a bank representative told him that "as a matter of policy, [it] would not open accounts for BVI corporations."  The bank representative replied that CIM Bank "[could] not accept a company registered in BVI" and noted that one of Demuth's requirements was that the bank "not require a personal meeting" (underlining in the original).  When Demuth forwarded CIM Bank's message to Abellan, Abellan responded, "James suggested that you try with this bank http://www.vpbank.com."  Demuth followed up the next day, "That was a good hint of James.  They open accounts for BVI corporations.  I guess the Beneficial Owners of the corporations are Argentinians?  Could I have the usual documentation?"  This email communication demonstrates the defendant's knowledge of and involvement in establishing foreign bank accounts for the nominee shareholders as well as his understanding of the need to conceal the true owners of the accounts, all in furtherance of the conspiracy.

In a later email dated May 3, 2013, Demuth emailed Abellan with a copy to the email address acct@strategysolutions.me, an account used by the defendant: "James said he would walk us through these forms from Aegis [Capital Corporation].  I tried but I really can't do it by myself."  Abellan responded that same day: "Game is in charge of completing

all broker forms. If you join Spark you will find him online."[13] Later in this email chain, on May 6, 2013, Demuth forwarded a document related to AFI's bank account at Zug Kantonalbank to Abellan and the defendant. This email supports the defendant's knowledge that the coconspirators – and not the nominee shareholders – controlled the financial transactions, brokerage accounts, and bank accounts used to effectuate the scheme.

In another such email sent after trading in Biozoom began, on June 10, 2013, Demuth told Abellan that he was having trouble reaching Abellan over the phone. Abellan responded, "Try again until the line is free please. James must be using it." This evidence supports that the defendant and Abellan were operating out of the same location during the "pump" portion of the scheme, when the defendant was communicating with brokerage houses and the coconspirators were conducting trading in Biozoom shares from accounts held in the names of the nominee shareholders.

### 3. Substantial Independent Evidence Connects the Defendant to the Conspiracy

These materials, standing alone, show the coconspirators putting their scheme into motion and communicating in furtherance of the conspiracy. *See United States v. Martinez*, 5 F.3d 542, at *2 (9th Cir. 1993) ("It is clear that the court may consider the challenged hearsay statements themselves in making these determinations.") In addition, the government expects witness testimony and documentary evidence to provide independent

---

[13] "Game" was an alias for Ciupiak. "Spark" refers to the instant messaging platform that the coconspirators used to communicate.

evidence of the defendant's connection to the conspiracy.  *See United States v. Hernandez*, 45 F. App'x 686, 688-89 (9th Cir. 2002).  For example, the government expects employees from broker dealers such as California-based firm BMA Securities and Arizona-based firm Scottsdale Capital to testify regarding the defendant's critical role referring individuals later identified as nominee shareholders for brokerage accounts.  In particular, the defendant requested that Scottsdale Capital authorize trading over instant message when Scottsdale Capital typically restricted such practice.  Trading over instant message was an important component of the conspiracy as it permitted Abellan and the coconspirators to trade on behalf of the nominee shareholders while concealing their identities.  In addition to testimonial evidence connecting the defendant to the nominee shareholders, the government expects that Biozoom executives will testify that the defendant met with them about taking their company public and encouraged an aggressive schedule of press releases that coincided with the "pump" in Biozoom stock.

The evidence will also show that the defendant was involved in an advertising campaign to print and disseminate mailers advertising Biozoom stock.  The mailers purported to be independent stock analysis and were distributed to homes and brokerage houses across the United States.  A printing company representative is expected to testify that he communicated with a representative from Foresight Media, which circumstantial evidence will show was in fact Abellan.  Abellan, using various aliases, told the printer to speak to the defendant. For example, in an email dated June 26, 2013, Abellan contacted the printer about an outstanding $100,000 payment and instructed the printer to "call James

so he can keep you updated on the wire." The employee confronted Abellan about his failure to send the payment on July 9, 2013, explaining that he had "spoke[n] with James. He said he was going to take care of the $100,000 wire that was owed." Abellan replied, "We need a few days to move funds from a different place because the escrow attorney got a subpoena and it was not appropriate to send money to you from there." These emails showing Abellan and the defendant struggling to pay the printer coincide with the Securities and Exchange Commission's ("SEC") suspension of Biozoom trading on June 25, 2013 and the subsequent freeze on the nominee shareholders' brokerage accounts on July 3, 2013.[14] In this way, the communications connect the defendant to the execution of the Biozoom promotional campaign and the subsequent scramble when their accounts were frozen, providing further proof of his intent and knowledge of the scheme.

The media campaign and press releases were critical to piquing investor interest in Biozoom shares, which in turn inflated the price of Biozoom shares contributing to the "pump" portion of the scheme. The evidence of the defendant's direct involvement in the press releases and Biozoom mailers provides evidence that he knew the importance of promoting Biozoom during the scheme and intentionally undertook efforts to inflate the price of Biozoom stock.

---

[14] When the printer asked about this outstanding payment in October 2013, Abellan responded: "The SEC case has affected all our bank accounts, which got a temporal freeze. . . . As soon as liquidity is back we'll wire the pending funds."

**CONCLUSION**

Both the statements themselves and the independent evidence show that the defendant, Abellan, Ciupiak, and Demuth actively engaged in a conspiracy to orchestrate a complex pump-and-dump scheme involving Biozoom. Moreover, these communications are "in furtherance of the scheme" in that they show the defendant and his coconspirators orchestrating financial transactions to fund Biozoom trading, establishing bank and brokerage accounts for nominee shareholders, and directing Biozoom trades, all integral parts of the scheme. *See United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993) ("To be 'in furtherance' a statement must advance a common objective of the conspiracy or set in motion a transaction that is an integral part of the conspiracy."). The evidence that the government expects to admit at trial, taken with the coconspirators' statements, establishes the defendant's connection to the conspiracy through his efforts to open brokerage accounts for nominee shareholders and his involvement in the Biozoom press campaign.

The government respectfully requests that this Court grant the government's motion to admit email, text message, and personal statements by Abellan, Dean, Ciupiak, Demuth, and the nominee shareholders as coconspirators' statements under Federal Rule of Evidence 801(d)(2).

Dated:       April 27, 2020

|   |   |   |
|---|---|---|
|   |   | Respectfully submitted, |
|   |   | ROBERT ZINK<br>Chief, Fraud Section |
|   | By: | */s/ Michelle Pascucci*<br>Tracee Plowell, Senior Litigation Counsel<br>Michelle Pascucci, Trial Attorney<br>Fraud Section, Criminal Division<br>U.S. Department of Justice |

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on April 27, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notification to counsel of record.

                                        Respectfully submitted,

BY:   */s/ Michelle Pascucci*