NCP Law PLLC
3200 N. Central Ave., Suite 2550
Phoenix, AZ 85012
Telephone: (602) 428-3010

Andrea S. Tazioli (# 026621)
andrea@ncplawyers.com

*Attorneys for*
*Defendant James B. Panther, Jr.*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>          v.<br><br>James B. Panther, Jr.;<br><br>                    Defendant. | **Case No. CR-19-00448-PHX-DLR-2**<br><br>**DEFENDANT'S OBJECTION TO PRESENTENCE INVESTIGATION REPORT [DKT. 112]** |

Defendant James B. Panther Jr. ("Mr. Panther"), by and through undersigned counsel, and pursuant to Fed. R. Crim. P. 32, hereby lodges his objections to the Presentence Investigation Report Guideline ("PSR") on grounds more fully set forth herein.  The objections are intended not to deny responsibility, but rather to clarify certain factual issues and statements contained in the PSR.

## Ministerial Objections

### Defense Counsel Information (Page 1)

Page 1 of the PSR contains incorrect contact information for Mr. Panther's counsel, Andrea S. Tazioli.  Ms. Tazioli's contact information is as follows:

#47748.4

Andrea S. Tazioli
NCP Law, PLLC
3200 N. Central Ave., Suite 2550
Phoenix, AZ 85012
602.428.3010 (office); 703.599.2925 (cell)
andrea@ncplawyers.com

**Related Cases (Page 2)**

Mr. Panther has no personal knowledge regarding these related cases.

**Paragraph 63**

The last sentence of Paragraph 63 omits that Mr. Panther also serves as a caretaker for his father (alongside his mother).

**Paragraph 67**

This last two sentences of Paragraph 67 contain a misstatement regarding Mr. Panther's place of residence from 2011 to present. Mr. Panther and his family moved to Carlsbad (not San Diego) in 2011, and they continue to live in Carlsbad today.

**Paragraph 69**

The last sentence of Paragraph 69 omits that in addition to Mr. Panther being primarily concerned with improving his family's financial situation, Mr. Panther is also concerned about contributing to society and helping others.

**Objections**

**Paragraph 7**

Mr. Panther objects to the statement contained in Paragraph 7 that the "defendants" controlled a publicly traded company known as Biozoom, a Nevada Corporation with a principal place of business in Kassel, Germany.

While Mr. Panther fully admits that he conspired with others to commit securities fraud and wire fraud and that he participated in the scheme, Mr. Panther did not control Biozoom. Rather, Biozoom was controlled by Francisco Abellan and others. *See, e.g., Plea Agreement,* DKT. 70 at 6:15-7:9; 10:17-26; PSR at ¶¶ 26, 29-32.

#47748.4

**Paragraph 8**

Mr. Panther objects to the general assertion that that "*the defendants*" arranged for various Argentine nationals to serve as straw purchasers of Biozoom shares.  Pursuant to the Factual Basis contained in Mr. Panther's Plea Agreement, "Abellan and Ciupiak arranged for ten Argentine nationals (the "nominee shareholders") to serve as nominee shareholders of EERT" (which later became Biozoom).  *See Plea Agreement,* DKT. 70 at 7:13-14; 9:15-16.

Mr. Panther objects to the general assertion that that "the *defendants*" the created false advertising and press releases, on the grounds that he did not "create" these advertisements or press releases.   Pursuant to the Factual Basis contained in Mr. Panther's Plea Agreement, "Abellan and the coconspirators manipulated the price of Biozoom shares through the dissemination of misleading and exaggerated promotional materials designed to give the appearance of a deep liquid market, thereby inducing victim investors to buy the stock with the eventual goal of the coconspirators selling the artificially-inflated stock at the height of the market for profit.  The factual information contained in the marketing materials was obtained from the due diligence material provided to the defendant and Dean by the Executives."  *See Plea Agreement,* DKT. 70 at 9:19-25.

Mr. Panther objects to the following general statement that once the stock value reached an acceptable level, "*the defendants* sold the Argentine nationals' stock at a profit. The funds were then transferred through various offshore bank accounts."  Mr. Panther did not sell the stock, nor did he transfer the funds to offshore bank accounts. As expressly stated in the Factual Basis section of his Plea Agreement, "once the stock attained significant gains in June 2013, Abellan and Ciupiak 'dumped' the Biozoom shares held in the name of the nominee shareholders and sent the proceeds to offshore banks they established in the names of nominee shareholders." *See Plea Agreement,* DKT. 70 at 10:22-25.  Per the Plea Agreement, Mr. Panther admits that his involvement

#47748.4

in the scheme included: assisting Abellan by "using IM" and being "in frequent contact with the Arizona brokerage house and others to check on the status of the accounts he referred." *Id.* at 10:13-16.

**Paragraph 9**

Mr. Panther objects to the first three sentences contained in Paragraph 9 on the grounds he did not commit these acts.  Mr. Panther asserts that prior to the issuance of his Indictment in April 2019, he did not have any knowledge of the conduct described in the first three sentences contained in Paragraph 9.

**Paragraphs 10-11**

Mr. Panther objects to the statements contained in Paragraphs 10-11 on the grounds that he did not commit these acts.  Mr. Panther asserts that prior to the issuance of his Indictment in April 2019, Mr. Panther did not have any knowledge of the conduct described in Paragraphs 10-11.

**Paragraph 12**

Mr. Panther objects to the statements contained in Paragraph 12 on the grounds that he did not commit these acts.  Specifically, Mr. Panther never met McKelvey or Sanders, nor did he work with them to broker the purchase of EERT. Mr. Panther also asserts that prior to the issuance of his Indictment in April 2019, Mr. Panther did not have any knowledge of the conduct described in Paragraph 12.

**Paragraph 14**

Mr. Panther objects to the statement contained in Paragraph 14 that he "worked with investors.  Mr. Panther asserts that he did not work with investors, but rather, he "was directed to approach Executives, on behalf of his conspirators, to pitch the investment opportunity." *See Plea Agreement,* DKT. 70 at 8:23-25.

Additionally, Panther objects that he "executed a service agreement between Abellan-owned entities and Opsolution."  As stated in the Factual Basis portion of his Plea Agreement, Mr. Panther "executed a service agreement between EERT/LeMond and

#47748.4

Devkom International, an entity controlled by the defendant, wherein defendant would provide consulting services in exchange for a total of $41,300 and an hourly fee of $275 per hour for work exceeding 180 hours in support of his efforts to negotiate the acquisition of Opsolution for the conspiracy." *See Plea Agreement,* DKT. 70 at 8:25-9:2.

**Paragraphs 15-16**

Mr. Panther objects to the statements contained in Paragraphs 15-16, as he did not commit these acts.   Prior to the issuance of his Indictment in April 2019, Mr. Panther did not have any knowledge of the conduct described in Paragraphs 15-16.  *See, e.g., Plea Agreement,* DKT. 70 at 6:22-7:9.

**Paragraph 18**

Mr. Panther objects to the statements contained in Paragraph 18 on the grounds that he did not commit these acts. Prior to the issuance of his Indictment in April 2019, Mr. Panther had no knowledge of the conduct described in Paragraph 18.  *See, e.g., Plea Agreement,* DKT. 70 at 7:13-15.

**Paragraph 19**

Mr. Panther objects to the statement contained in Paragraph 19 that "Abellan and Panther opened stock trading accounts in the names of Argentine nationals at various brokerage accounts…" as Mr. Panther did not per se open any stock trading accounts. As expressly stated in the Factual Basis section of his Plea Agreement, Mr. Panther's admits that his conduct in the scheme included: (i) "obtain[ing] a signature of one of the nominee shareholders…which was then submitted to a U.S. brokerage house via email in an attempt to clear the shares for trading"; (ii) "facilitat[ing] and arrang[ing] for the introduction of his coconspirators to the United States brokerage firms;" (iii) along with attorney Dean, "arrang[ing] for the issuance of an opinion letter falsely declaring the shares were not required to bear a restrictive legend and could not be sold without registration;" and (iv) "provid[ing] documentation to open accounts at brokerage firms." *See Plea Agreement,* DKT. 70 at 7:15-8:8.

#47748.4

**Paragraph 22**

Mr. Panther objects to the statements contained in Paragraph 22 on the grounds that he did not commit these acts.  Prior to the issuance of his Indictment in April 2019, Mr. Panther did not have any knowledge of the conduct described in Paragraph 22.

**Paragraph 26**

Mr. Panther objects to the statements contained in Paragraph 26 on the grounds that he had no involvement whatsoever in: (i) the dumping of Biozoom shares in June 2013; (ii) the execution or submission of withdrawal request forms to brokerage houses in June 2013; (iii) the wiring or transferring of Biozoom proceeds in June 2013; or (iv) the execution of secured loan agreements in June 2013. *See Plea Agreement,* DKT. 70 at 10:22-25.

**Paragraph 27**

Mr. Panther objects to the statements contained in the last two sentences of Paragraph 27 on the grounds that he did not commit these acts.  Prior to the issuance of the Indictment in April 2019, Mr. Panther did not have any knowledge of the conduct described in the two sentences of Paragraph 27.

**Paragraphs 29-32**

Mr. Panther objects to the statements contained in Paragraphs 29-32 on the grounds that he did not commit these acts. Prior to the issuance of his Indictment in April 2019, Mr. Panther had no knowledge of the conduct described in Paragraphs 29-32.

**Paragraph 33**

Mr. Panther objects to the final amount of restitution owed in the amount of $16,358,857.01 (as calculated by FINRA's Office of General Counsel) on the grounds that this amount does not take into consideration that the SEC froze $16 million in

#47748.4

proceeds from the scheme and has already return monies to victims. *See Plea Agreement,* DKT. 70 at 10:27-28. A SEC press release dated May 15, 2018 (2018-85) which pertains to Biozoom and Mr. Panther (along with other defendants), states that the "SEC obtained a court order in 2013 freezing proceeds from the unlawful Biozoom sales. It subsequently obtained a default judgment and established a fair fund, which has returned more than $14 million to harmed investors…" Moreover, when calculating the restitution owed in this case, the amount that has already been paid to victims (now likely over $14 million) must be offset by the $16 million in frozen assets. Moreover, if victims have already been paid through the fair fund, then they cannot double dip and ask for additional monies in restitution.

**Paragraph 34**

Mr. Panther seeks to clarify the statement contained in Paragraph 34 that Mr. Panther "is responsible for the total loss amount of $33,997,152." This amount is not the actual loss, but rather the "intended loss" which is consistent with the statement contained in Paragraph 43 of the PSR. The actual loss amount must take into consideration that $16 million was seized/recovered.

**Paragraph 38**

Mr. Panther objects to the final amount of restitution owed in the amount of $16,358,857.01 (as calculated by FINRA's Office of General Counsel) on the grounds that this amount does not take into consideration that the SEC froze $16 million in proceeds from the scheme and has already return monies to victims. *See Plea Agreement,* DKT. 70 at 10:27-28. Additionally, a SEC press release dated May 15, 2018 (2018-85) which pertains to Biozoom and Mr. Panther (along with other defendants), states that the "SEC obtained a court order in 2013 freezing proceeds from the unlawful Biozoom sales. It subsequently obtained a default judgment and established a fair fund, which has returned more than $14 million to harmed investors…" When calculating the restitution owed in this case, the amount that has already been paid to victims (now likely over $14

#47748.4

million) must be offset by the $16 million in frozen assets.  Moreover, if victims have already been paid through the fair fund, then they cannot double dip and ask for additional monies in restitution.

**Paragraph 43**

Mr. Panther objects to the use of the "intended loss amount" when calculating the loss amount in this case.  Paragraph 43 expressly states that "twenty-two levels are added as the loss exceeded $25,000,000.00 but less than $65,000,000.00; that is, the intended loss was $33,997,152."

Mr. Panther asserts that the "actual loss" should be used when calculating the total loss amount.  In this case, after taking into consideration the $16 million that was recovered/seized by the government, the actual loss amount as calculated by FINRA's Office of General Counsel is $16,358,857.01.  By using the actual loss amount, twenty levels would be added (as opposed to 22 levels) as the loss exceeded $9,500,000.00 million but was less than $25,000,000.00. USSG §2B1.1(b)(1)(K); *see also United States v. Banks*, 55 F.4th 246 (3d Cir. 2022) (holding that sentencing guideline providing graduated scale of increases based on monetary amount of loss **applies only to actual loss**) (emphasis added).

**Paragraph 45**

According to Paragraph 45, "two levels are added as a substantial part of the offense was committed outside the United States, that is in Spain."  Mr. Panther objects to this special offense characteristic and addition of two levels on the grounds that while a portion of the scheme did occur in Spain, a substantial portion of the scheme occurred actually occurred in the United Statues.  Indeed, a majority of the brokerage trading was conducted in the United States using FINRA regulated United States brokerage firms that were based in California and Arizona and United States banks. A large portion of Mr. Panther's criminal conduct also took place in the United States. Moreover, on

#47748.4

information, the SEC froze $16 million of the proceeds from the scheme from accounts in the United States. *See Plea Agreement,* DKT. 70 at 7:15-8:8, 10:247-28.

**Paragraph 49**

Based on the objections contained in Paragraphs 43 and 45, Mr. Panther asserts that the adjusted offense level should be 28.

**Paragraph 53**

Based on the objections contained in Paragraphs 43, 45, and 49, Mr. Panther asserts the total offense level should be 25.

**Paragraph 74**

Mr. Panther objects to the characterization of his prior conviction as a DUI.  As stated in Paragraph 55 of the PSR, Mr. Panther was convicted of Reckless Driving (a misdemeanor offense) and <u>not</u> Driving Under the Influence.

**Paragraph 92**

Mr. Panther objects to Paragraph 92, as he was not provided with an attached spreadsheet of restitution due and owing to victims.  Additionally, Mr. Panther reiterates his objections to Paragraphs 33 and 43 stated above regarding the restitution amount owed.

**Paragraph 101**

Mr. Panther objects to the statement contained in Paragraph 101 that he has done well on release conditions for "a period of two years."  Mr. Panther has been subjected to release conditions for four years, and he has done well on his release conditions for the last **four years**.

### **Sentencing Recommendation**

Mr. Panther objects to the sentence contained in the Justification portion of the Sentencing Recommendation (page 22, sentence 3) which states that he "set up brokerage account and bank accounts for individuals in the conspiracy," as he never set up any brokerage account or bank account per se. As expressly stated in the Factual Basis

#47748.4

section of his Plea Agreement, Mr. Panther's involvement in the scheme included: (i) "obtain[ing] a signature of one of the nominee shareholders…which was then submitted to a U.S. brokerage house via email in an attempt to clear the shares for trading"; (ii) "facilitate[ing] and arrang[ing] for the introduction of his coconspirators to the United States brokerage firms;" (iii) along with Dean, "arrang[ing] for the issuance of an opinion letter falsely declaring the shares were not required to bear a restrictive legend and could not be sold without registration;" and (iv) "provid[ing] documentation to open accounts at brokerage firms." *See Plea Agreement,* DKT. 70 at 7:15-8:8.

The Justification portion of the Sentencing Recommendation (page 23) also states that "the scheme resulted in approximately $34,000,000.00 in intended loss, and the forensic analysis reported a restitution amount of $16,358,857.01.  The likelihood the entire sum will ever be paid to the victims in this case is very low, given the limited earning potential of the defendant and the extensive restitution amount."

As stated above, Mr. Panther objects to the final amount of restitution owed in the amount of $16,358,857.01 (as calculated by FINRA's Office of General Counsel) on the grounds that this amount does not take into consideration that the SEC froze $16 million in proceeds from the scheme on or about June 2013 and has already return monies to victims. *See Plea Agreement,* DKT. 70 at 10:27-28.  Additionally, a SEC press release dated May 15, 2018 (2018-85) which pertains to Biozoom and Mr. Panther (along with other defendants), states that the "SEC obtained a court order in 2013 freezing proceeds from the unlawful Biozoom sales.  It subsequently obtained a default judgment and established a fair fund, which has returned more than $14 million to harmed investors…" When calculating the restitution owed in this case, the amount that has already been paid to victims must be offset by the $16 million in frozen assets.  Moreover, if victims have already been paid through the fair fund, then they cannot double dip and ask for additional monies in restitution.  Given this information, the amount of restitution owed is much less than the $16,358,857.01 listed in this section.  Given Mr. Panther's current

#47748.4

financial condition, even if the restitution amounts owed were significantly reduced, he would still be unable to make any substantial restitution payments.

RESPECTFULLY SUBMITTED this 24th of March 2023

NCP Law, PLLC
3200 N. Central Avenue, Suite 2550
Phoenix, Arizona 85012

By: _____
Andrea S. Tazioli (#026621)

*Attorneys for Defendant James B. Panther, Jr.*

#47748.4

11

**CERTIFICATE OF SERVICE**

I certify that on the 24th day of March 2023, I electronically transmitted the foregoing document to the Office of the Clerk of the Court, using the CM/EFC System, for filing and for transmittal of a Notice of Electronic Filing to the CM/EFC registrants on record.

I certify that I sent this document via email to Assistant United States Attorney Deborah Brittain Shaw at the following email address: Brittain.Shaw@usdoj.gov.

I further certify that I sent this document via email to Senior United States Probation Officer Corinne L. Underwood at: Corinne_Underwood@azd.uscourts.gov.


/s/ Andrea S. Tazioli____

#47748.4